## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 11 2018, 8:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew C. Maples
Hocker & Associates, LLC
Indianapolis, Indiana

ATTORNEY FOR APPELLEES

Pamela G. Grant-Taylor
Law Office of Pamela Grant Taylor
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Guardianship of: A.S.S. | May 11, 2018 |
| Glen Scisney, | Court of Appeals Case No. 49A02-1708-GU-1921 |
| *Appellant-Respondent*, | Appeal from the Marion Superior Court |
| v. | The Honorable Steven R. Eichholtz, Judge |
| Saleem Adams and Tamara Adams, | Trial Court Cause No. 49D08-1604-GU-11850 |
| *Appellees-Petitioners*. | |

**Brown, Judge.**

[1] Glen Scisney appeals the trial court's order naming Saleem and Tamara Adams as the guardians of A.S.S. ("Child"). Scisney raises several issues which we revise and restate as whether the trial court abused its discretion in naming the Adamses as the guardians of Child. We affirm.

## Facts and Procedural History

[2] Child and A.E.S., who was Child's twin sibling (Child and A.E.S., together, the "Children"), were born on January 27, 2016, to Kimberly Scisney ("Mother").[1] Mother was overwhelmed with the idea of parenting the Children and approached the Adamses, who attended the same church as Mother, as potential persons who might adopt the Children. The Children were placed with the Adamses on March 20, 2016, and Mother later signed a power of attorney and health powers of attorney granting attorney-in-fact powers to the Adamses to act on behalf of the Children. A short time later, Mother died as a result of an automobile accident. On April 5, 2016, the Adamses filed a petition requesting that the court appoint them as Child's guardians and stating that Child had been in their care since March 20, 2016, when Mother expressed that her desire for Child to live with them, and that both of Child's parents had signed a power of attorney on March 28, 2016. The court appointed a guardian ad litem (the "GAL"), and the GAL filed a report with the court on June 20,

---

[1] The trial court issued a similar order naming the Adamses as the guardians of A.E.S. under cause number 49D08-1604-GU-11848 ("Cause No. 848"). We also issue a memorandum decision today affirming the trial court's order in Cause No. 848.

2016. The court held a hearing on that day and later issued an order stating that Scisney is the maternal grandfather of Child and that Scisney appeared at the June 20, 2016 hearing and indicated he would be seeking guardianship and did not contest the appointment of the Adamses as temporary guardians and granting temporary guardianship of Child to them. On August 17, 2016, Scisney filed a motion to contest the appointment of guardianship. On August 25, 2016, Scisney filed a counter-petition requesting that the court appoint him as the permanent guardian of Child.

[3] On December 5, 2016, the court held a hearing at which it admitted into evidence the GAL's report and other documentary evidence and heard testimony from Scisney, the Adamses, the GAL, and Devante Connor, the putative father of the Children, among others. On June 13, 2017, after Scisney filed a motion to produce order, the court issued an order naming the Adamses as the guardians of Child. The order provides:

> 3. Kimberly Scisney is the biological mother of [the Children].
>
> 4. Devonte Connor is the alleged father but has never filed to establish paternity.
>
> 5. Kimberly Scisney was killed in an automobile accident a few months after giving birth to the twins.
>
> 6. Saleem and Tamara Adams belonged to the same church that Kimberly Scisney attended.
>
> 7. Kimberly Scisney approached Saleem and Tamara Adams about taking care of her children shortly before she died in a car accident.

8. Kimberly Scisney turned the twins over to Saleem and Tamara Adams on March 20, 2016 along with health care and personal power[s] of attorney[] so they could obtain medical attention for the children.

9. The alleged father, Devonte Conner [sic], also signed the aforementioned power[s] of attorney[] even though he had not established paternity.

10. Counter/Petitioner, Glenn [sic] Scisney, is the biological maternal grandfather of the minor twins and filed his Counter/Petition on August 25, 2016.

11. Glenn Scisney resides in Madisonville, KY with his present wife . . . and two children . . . .

12. The Court appointed Kids' Voice of Indiana as Guardian ad Litem of the minor twins . . . .

13. The Guardian ad Litem interviewed the petitioners and many other relatives and non-relatives and submitted its' [sic] report to the Court on June 20, 2016.

14. Saleem and Tamara Adams are both employed and Tamara Adams works from home which allows her to care for [the Children] at the same time.

15. Tamara Adams testified that they now live in a home with 3290 square feet and five bedrooms.

16. Both of the twins suffer from medical conditions that the Adams[es] have monitored and taken them to doctors visits. [A.E.S.] has been diagnosed with sickle cell anemia and [Child] with tracheomalacia and laryngomalacia.

17. Saleem and Tamara Adams have not been convicted of a felony.

18. Testimony was given that the reason the mother, Kimberly Scisney, did not want [Scisney] to have custody of the minor twins is that he had been very abusive to her.

19. Glenn Scisney is the biological grandfather of [the Children].

20. Glenn Scisney testified that he is employed and has two part time jobs one of which is in Indianapolis.

21. Glenn Scisney also testified that he is building an addition to his home to accommodate his grandsons.

22. Glenn Scisney has not had much contact with the twins and testified that the reason for that is the Adams[es] refused to let him have visitation. The report of the Guardian ad Litem confirms that the Adams[es] refused to allow Glenn Scisney visitation based on the allegations of Kimberly Scisney of his abusive actions against her.

23. As mentioned above the Guardian ad Litem interviewed the parties to this matter and also other relatives and non-relatives and submitted its recommendation to the Court in its report dated June 20, 2016.

24. Based on the evidence and testimony presented, the Court grants guardianship of the [Children], to Saleem and Tamara Adams.

25. The Court also orders Saleem and Tamara Adams to allow visitation to Glenn Scisney based on their schedules.

26. IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED, that Saleem and Tamara Adams, Petitioners, are hereby appointed Guardians of the Person of [A.E.S.] and [Child], and the Clerk is directed to issue Letters of Guardianship to Saleem and Tamara Adams upon subscribing an Oath.

Appellant's Appendix Volume 2 at 15-17. Scisney filed a motion to correct error, which the trial court denied.

## Discussion

[4] The issue is whether the trial court abused its discretion in naming the Adamses as guardians of Child. The trial court is vested with discretion in making determinations as to the guardianship of an incapacitated person or minor. *In re Guardianship of A.L.C.*, 902 N.E.2d 343, 352 (Ind. Ct. App. 2009). This discretion extends to both its findings and its order. *Id*. We apply the abuse of discretion standard to review the trial court's findings and order. *Id*. Because the court set forth findings, we look to those findings to determine whether the court abused its discretion. *See id.* The findings will not be set aside unless clearly erroneous. *Id*. Findings are clearly erroneous when the record lacks any facts or reasonable inferences to support them. *Id.* Further, we will not set aside the judgment unless clearly erroneous. *Id.* A judgment is clearly erroneous when unsupported by the findings of fact and conclusions thereon. *Id*.

[5] Scisney asserts the court's findings are not supported by the evidence, that the court abused its discretion in finding that the Adamses were the most suitable persons to be guardians of Child, that he is the most stable party in this matter and the most suitable person to be named guardian of Child, and that it would be in Child's best interest for him to be named guardian. He argues that he requested the power of attorney documents but never received them, those documents were not offered into evidence, and the finding in paragraph 8 of the

trial court's order is not supported by evidence. He argues that the evidence does not support the court's finding in paragraph 18 and that, if these findings were to be set aside, the remaining evidence most favorable to the Adamses would not support the court's determination. He also asserts the evidence does not support the findings in paragraphs 7 and 14 of the court's order. Scisney further argues that he is clearly the most suitable party to be named guardian over his own grandchild. In support of his argument, he points to his housing and room for Child, the length of his marriage and residence in his house, the fact an elementary school is located approximately one-quarter of a mile from his home, his employment teaching autistic children part time, and that he is the only relative who has petitioned to be appointed guardian. He also argues that the Adamses deceived Child's family and friends by posting fake crowd-sourcing websites to raise money in the name of Child, have an unstable income, and were evicted during the proceedings in this case.

[6]     The Adamses maintain that the trial court did not err in naming them as the guardians of Child and correctly determined they were suitable persons to be appointed under Ind. Code § 29-3-5-4(2). They argue the court was not required to enter special findings and that the evidence supports the court's findings. They assert that the GAL's report was admitted into evidence, contained a copy of the power of attorney executed by Mother and Connor, and included information gathered from family members of Mother which substantiate the claim that Mother desired for Child to be in their custody. The

Adamses also maintain that Scisney's argument is simply a request to reweigh the evidence and reassess the credibility of the witnesses.

[7] The guardianship statutes provide for the appointment of guardians for minors. *See* Ind. Code § 29-3-5-1. Ind. Code §§ 29-3-5 set forth proceedings for the appointment of a guardian, and Ind. Code § 29-3-5-3 provides that, if it is alleged and the court finds that the individual for whom the guardian is sought is an incapacitated person or a minor and the appointment of a guardian is necessary as a means of providing care and supervision of the physical person or property of the incapacitated person or minor, the court shall appoint a guardian under the chapter.

[8] At the time of the December 2016 hearing, Ind. Code § 29-3-5-4 provided:

> The court shall appoint as guardian a qualified person or persons most suitable and willing to serve, having due regard to the following:
>
> (1)    Any request made by a person alleged to be an incapacitated person, including designations in a durable power of attorney under IC 30-5-3-4(a).
>
> (2)    Any request contained in a will or other written instrument.
>
> (3)    A designation of a standby guardian under IC 29-3-3-7.
>
> (4)    Any request made by a minor who is at least fourteen (14) years of age.
>
> (5)    Any request made by the spouse of the alleged incapacitated person.

(6)     The relationship of the proposed guardian to the individual for whom guardianship is sought.

(7)     Any person acting for the incapacitated person under a durable power of attorney.

(8)     The best interest of the incapacitated person or minor and the property of the incapacitated person or minor.

(Subsequently amended by Pub. L. No. 194-2017, § 7 (eff. Jul. 1, 2017)).[2]

Ind. Code § 29-3-5-5 provided:

(a)     The following are entitled to consideration for appointment as a guardian under section 4 of this chapter in the order listed:

(1)     A person designated in a durable power of attorney.

(2)     A person designated as a standby guardian under IC 29-3-3-7.

(3)     The spouse of an incapacitated person.

(4)     An adult child of an incapacitated person.

(5)     A parent of an incapacitated person, or a person nominated by will of a deceased parent of an incapacitated person or by any writing signed by a parent of an incapacitated person and attested to by at least two (2) witnesses.

---

[2] The 2017 amendment inserted a new subsection (2) and redesignated former subsections (2) to (8) as subsections (3) to (9). The new subsection (2) provides: "(2) Any request made for a minor by: (A) a parent of the minor; or (B) a de facto custodian of the minor, including a designation in a power of attorney under IC 30-5-3-4(b) or IC 30-5-3-4(c)."

(6)    Any person related to an incapacitated person by blood or marriage with whom the incapacitated person has resided for more than six (6) months before the filing of the petition.

(7)    A person nominated by the incapacitated person who is caring for or paying for the care of the incapacitated person.

(b)    With respect to persons having equal priority, the court shall select the person it considers best qualified to serve as guardian. The court, acting in the best interest of the incapacitated person or minor, may pass over a person having priority and appoint a person having a lower priority or no priority under this section.

(Subsequently amended by Pub. L. No. 194-2017, § 8 (eff. Jul. 1, 2017)).

[10]    The court, pursuant to Ind. Code § 29-3-5-4, must give due regard to the best interest of a minor and, acting in the best interest of the minor, may pass over a person having priority and appoint a person having a lower priority or no priority under Ind. Code § 29-3-5-5. *In re Guardianship of A.L.C.*, 902 N.E.2d at 353. The key consideration, in essence, in selecting a guardian for Child is whether the choice of guardian is in Child's best interest. *See id*.

[11]    To the extent Scisney contests the trial court's findings in paragraphs 7, 8, 14 and 18 of its June 13, 2017 order, we observe that Tamara testified that the Children had come into her care and custody on March 20, 2016, and that Mother had contacted her and Saleem shortly after the Children were born. The GAL's report indicated that Mother was overwhelmed with the idea of single parenthood prior to the birth of the Children, that she attended the same

church as the Adamses, and that she had approached the Adamses as potential persons who might adopt the Children. We further observe that the GAL's report stated that, "[t]o ensure that they had the full ability to the extent reasonably necessary to provide all the care that might be necessary in the short time that they were supposed to have the children, the Adams[es] requested that they be given power of attorney for the children and health power of attorney" and "[t]hey received and kept the executed documents (which were also signed by the putative father, despite his legal claim as a father/parent being tenuous, if not nonexistent), and the GAL reviewed these during the home visit." Guardian Ad Litem Exhibit I at 5. The GAL's report included attached executed documents including a power of attorney and health powers of attorney dated in March 2016 and signed by Mother which granted attorney-in-fact powers to the Adams[es] to act on behalf of Child.[3] Tamara testified that she works from home using a customer service system and phone, that she has the ability to care for the Children while working, and that her office is in the room where the Children take their naps, and Saleem indicated he is employed as a customer service agent for a company which provides tax return preparation assistance.

[12] Further, the GAL's report indicated that Roberta Edwards, the Children's maternal grandmother, stated that she was somewhat surprised and upset that her daughter had not considered her for guardianship but instead went straight

---

[3] The Power of Attorney for Child instrument was also signed by Connor.

to the Adamses, that in any event she could not accept care or custody of the Children, that she was of the opinion that Scisney has been verbally abusive to Mother, that she had observed Mother crying and upset after speaking with Scisney on the phone a few times, that Mother had unequivocally expressed a desire for the Adamses to have and hopefully adopt the Children, and that they allowed her and any of her extended family to see the Children. The report also indicated that Crista Spiller, Mother's cousin, stated that Scisney "was the last person to find out from [Mother] about the pregnancy and that [Mother] had stated to her that [Scisney] was the very last person on earth that she would want to have her children" and that "[s]he recalled that [Scisney] had told [Mother] he would disown her if she ever got pregnant, and that he did in fact do so when he found out." *Id*. at 9-10. The report further indicated that Scisney stated he had counseled his daughter not to become pregnant out of wedlock and having such "bastards" would be wrong and greatly disappoint him, that Mother would become upset at this fatherly advice, and that in no way was the interaction ever abusive or less than fatherly or loving. *Id*. at 12. The GAL's report, in its summary, indicated that it was widely acknowledged that Mother desired that the Children be placed with the Adamses. We cannot say that the record lacks any facts or reasonable inferences to support the court's findings in paragraphs 7, 8, 14 and 18 of its order.

[13] The record further reveals that the court admitted documentary evidence and testimony related to the suitability of the Adamses and Scisney as guardians and the considerations set forth in Ind. Code §§ 29-3-5-4 and -5. The court

admitted evidence regarding the parties' financial resources, employment and earnings, and the stability of those resources and earnings. It also heard testimony regarding the Adamses' care of the Children, the health histories of the Children, the history and stability of the Adamses' housing, and that Go Fund Me funds were established to solicit donations for the Children and Mother.[4] The court also heard testimony regarding Scisney's home and room for the Children, his marriage and children, his proximity to an elementary school, and his work with children and other work. The reports regarding Mother's relationship with Scisney and her desire for the Children to be placed with the Adamses were also before the court. Mother and Connor executed a Power of Attorney for Child in favor of the Adamses with respect to the care of Child on March 28, 2016. The court was able to review and consider the evidence, including the evidence related to the parties' resources and families and to Mother's wishes, in exercising its discretion in determining the most suitable persons to be appointed as the guardians of Child under the circumstances. Scisney has not shown that the trial court's findings are not supported by the record or that the court's judgment is not supported by its findings.

---

[4] The GAL's report attached copies of a Go Fund Me webpage indicating that $300 had been raised for Children and a similar page indicating that $135 had been raised for Mother. The Go Fund Me page for Mother indicates it was established or sponsored by Edwards, and the GAL testified that the Adamses indicated that the funds were transferred to their personal account.

Based upon the evidence and testimony presented at the December 5, 2016 hearing, we are unable to conclude that the trial court abused its discretion in appointing the Adamses as the guardians of Child.

## *Conclusion*

For the foregoing reasons, we affirm the order of the trial court naming the Adamses as guardians of Child.

Affirmed.

Bailey, J., and Crone, J., concur.